[Civ. No. 5991.  Third Appellate District.—February 15, 1938.]

BOLSA LAND COMPANY (a Corporation), Respondent, v. VAQUEROS MAJOR OIL COMPANY, LTD. (a Corporation), et al., Defendants and Appellants; STATE OF CALIFORNIA, Intervener and Appellant.

U. S. Webb, Attorney-General, L. G. Campbell, Walter L. Bowers, R. S. McLaughlin and John O. Palstine, Deputies Attorney-General, Webb Shadle, Pease & Dolley and Adolph H. Levy for Appellants.

Gibson, Dunn & Crutcher, H. F. Prince and J. Stuart Neary for Respondent.

PLUMMER, J.—This is an appeal by the defendants and intervener from a judgment in favor of the plaintiff, in which action it was found by the court that the defendants had trespassed upon certain property belonging to the plaintiff, and thereupon granted an injunction restraining further acts of trespass.

The real question before this court for our consideration is the method of ascertaining the line of demarkation between lands classed as "tidelands" and lands classed as "uplands".

The defendants in the action entered upon certain lands, as assignees of a permit issued by the State of California granting certain drilling rights for the purpose of exploring certain tidelands for oil and other mineral substances. The plaintiff alleged that the structures erected by the defendants were partly upon lands owned by the plaintiff.

As the alleged trespass has been discontinued, we have, as just stated, only the question of determining the method of ascertaining the line designated as "ordinary high water mark", as found in section 670 of the Civil Code. That section specifies that the state is the owner of all lands below tide water and below ordinary high water mark.

The defendants and the intervener contended in the trial court and likewise insist upon this appeal, that the term "ordinary high water mark" means a line along the shore left by the highest run or reach of the water, or stated in

the language of their brief: "1. Does this term 'ordinary high water mark' mean the line reached on the beach by the edge of the sea water when an ordinary high tide is at its full, and where the edge of such sea water on the beach leaves its visible mark upon the shore, plain to all or, 2. Does such term 'ordinary high water mark' mean an imaginary theoretical contour line arrived at by projecting to its intersection with the shore, the plane of the vertical rise of the tide only, and completely eliminating the higher line on the shore reached by the natural flow of the sea water when such tide is at its full?"

Stated in other language: Does the ordinary high water mark mean the run or reach of the water or waves upon the shore, or does it mean the vertical rise of the tide, and then the horizontal line projecting therefrom intersecting the shore? The uncertainty seems to arise from the confusion of the run of the sea water or reach of the sea water as it dashes up against the shore with what is really intended by the term "ordinary high water mark" as determined by the actual rise of the tide. Or, expressed in other words: Does the run or reach of the sea-water upon the shore as it advances and recedes, have any connection whatever in legal meaning with what is known as tide-water?

The respondent contended in the trial court, and upon this appeal contends that the "ordinary high water mark" is to be determined by ascertaining the mean ordinary rise of the tides, and then projecting a horizontal line to the shore. In determining the mean rise of the tides and what is meant thereby, it appears that the federal government has adopted a rule which takes into consideration all of the tides, while the rule adopted by the State of California includes only what is ordinarily called "neap" tides. Wherever the lands are granted by the federal government, a federal question of course is involved, and the rule adopted by the Supreme Court of the United States is controlling.

In the determination of the present controversy it appears that the court excluded certain of the higher tides which under the federal rule should have been included.

The appellants contend that the position taken by the respondents and by the trial court is in furtherance of a rule which is new and novel, and that the true method of determining "ordinary high water-mark" is the line left

by the water along the shore. This contention, however, does not seem to be supported by the authorities.

In 1908, in the case of *Eichelberger* v. *Mills Land & Water Co.,* 9 Cal. App. 628 [100 Pac. 117], in considering the finding made by the trial court, the language used is as follows: "This is not a finding as to the width of the tract, for the reason that neither the point of extreme reach of the wash of the waves, nor the highest point of tide level constitutes the boundary line of lands bordering on the ocean. The law takes notice of three kinds of tides, namely: 1. The high spring tides, which are fluxes of the sea, and those tides which happen at the two equinoctials; 2. The spring tides which happen every month at the full and change of the moon; 3. The neap or ordinary tides which happen at the change and full of the moon twice every twenty-four hours." (Citing authorities.) "Tidelands are such as are covered and uncovered by the flow and ebb of the ordinary neap tides."

In *Forgeus* v. *County of Santa Cruz,* 24 Cal. App. 193 [140 Pac. 1092], where the court held that the determination of the ordinary high-water mark was a question of fact, and that the line determined by the United States Geodetic Survey might be taken into consideration, it was held, also, that the term "ordinary high-water mark" meant the limit reached by the neap tides, that is, those tides which happen between the full and change of the moon twice in every twenty-four hours (citing authorities), and then refers to the Eichelberger case, *supra,* as follows: "to the extent that it is in point at all, supports the position of appellant, inasmuch as it is held that a tract of land described as bordering upon the Pacific Ocean is delimited by 'the line to which the flow of the water reaches at ordinary or neap tide, unaffected by wind or wave, not the line of extreme high tide nor extreme reach of the wash of the waves' ".

In *F. A. Hahn Co.* v. *City of Santa Cruz,* 170 Cal. 436 [150 Pac. 62], the court said: "The high-water mark which defines the limit of the State sovereignty is the usual or ordinary high-water mark. By that designation we mean the limit reached by the neap tides, that is, those tides which happen between the full and change of the moon twice in every twenty-four hours."

In 62 C. J., page 951, "tideland" is described as follows: "In the usual meaning of the term, land between the lines

of the ordinary high and low tides, covered and uncovered successively by the ebb and flow thereof; land covered and uncovered by the ordinary tides; land over which the tide ebbs and flows; land which is daily covered and uncovered by water by the ordinary ebb and flow of normal tides; land usually overflowed by the neap or ordinary tides; such land as is affected by the tide, that lies between ordinary high-water mark and low-water mark, and which is alternately covered and left dry by the ordinary flux and reflux of the tides; that portion of the shore or beach covered and uncovered by the ebb and flow of ordinary tides.''

In *Otey* v. *Carmel Sanitary Dist.*, 219 Cal. 310 [26 Pac. (2d) 308], the latest expression of our Supreme Court as to the meaning of ''ordinary high-water mark'' is thus worded: ''Ordinary high-water mark is the limit reached by the neap or twice a day tides'' (citing authorities).

In 26 California Jurisprudence, page 321, section 536, the term ''high-water mark'' is thus defined: ''The high-water mark, which defines the limit of the state sovereignty, is the usual or ordinary high-water mark, that is, the limit reached by the neap tides, or those tides which happen at the change and full moon, twice in every twenty-four hours, rather than the monthly spring or extraordinary tides. That is to say, it is the line which the flow of the water reaches at ordinary or neap tide unaffected by wind or wave, not the line of extreme high-tide, nor the extreme reach of the wash of the waves, that constitutes the boundary line of a tract bordering on the ocean or other tidal waters. How far the tide reaches is a question of fact.''

As we have seen in the case of *Forgeus* v. *County of Santa Cruz, supra,* the United States Geodetic Survey may be taken into consideration in determining the height of the tide. In all the cases which we have cited the California rule is that the mean of the neap tide shall be taken into consideration in determining the high-water mark; that is, it is the mean level of the tide, and not merely the wash of the waves or the run of the sea-water upon the coast. Every case gives exactly the same definition,—mean level of the neap tides. No consideration whatever is given to the wash of the waves or the reach or the run of the sea-water upon the coast. Such movements of the sea are not considered in determining the height of the tide. In other words, the run or reach of the

sea-water does not measure the height of the tide. Nor does the run, roll or reach of the waves constitute the measure of the rise of the tide. Likewise, tide-water is confined to the level of the rise of the tide, and not to the run or reach of the waters caused by the waves or swell of the ocean.

In the case of *Borax Consolidated Co.* v. *City of Los Angeles,* 296 U. S. 10 [56 Sup. Ct. 23, 80 L. Ed. 9], the rule is thus stated: ''The tideland extends to the high-water mark. (Citing a number of cases.) This does not mean, as petitioners contend, a physical mark made upon the ground by the waters; it means the line of high-water as determined by the course of the tides. By the civil law the shore extends as far as the highest waves reach in the winter. (Citing authorities.) But by the common law, the shore 'is confined to the flux and reflux of the sea at ordinary tides'.''

The opinion in this case quotes largely from the language of certain English cases, but finally adopts the rule for determining the line of demarkation ascertained by the Geodetic Survey, taking the mean of the tides over a considerable period of time.

In fixing the rule that should be followed in determining the limit of a federal grant, the court used the following language: ''In determining the limit of the Federal grant, we perceive no justification for taking neap high tides, or the mean of those tides, as the boundary between upland and tideland, and for thus excluding from the shore the land which is actually covered by the tides most of the time. In order to include the land that is thus covered, it is necessary to take the mean high tide line, which, as the Court of Appeals [74 Fed. (2d) 901] said, is neither the spring tide nor the neap tide, but a mean of all the high tides. In view of the definition of the mean high tide, as given by the United States Coast and Geodetic Survey, that 'Mean high water at any place is the average height of all the high waters at that place over a considerable period of time,' it appears in that case that the court considered a period of time covering slightly more than eighteen years. It further appears, however, that with the datum plane of the Geodetic Coast Survey being available, the mean high-tide level can be ascertained within the limits of what we may call 'reasonable time'.''

From what we have said, it seems to us clear that ''ordinary high-water mark'' means just as the trial court

held, the ascertaining of the mean rise of the tide, and a horizontal line projecting therefrom to the shore, and that the run or wash of the waves, or reach of the water caused by the waves or swell of the ocean, has nothing to do with determining the "ordinary high-water mark", as determined by the rise of the tide. In other words, there is a clear distinction between mere sea-water and tide-water.

█ In the instant case it appears that the trial court erred in not taking into consideration all the tides in fixing the actual mean rise thereof. However, as the appellant is not entitled to a reversal of the judgment, and the plaintiff has not appealed from the judgment, and the action is not one to quiet title, we do not find any necessity for remodeling the findings of the trial court and the entering of a corrected judgment. The main issue involved is the one which we have determined, to wit: The method of determining what is meant by the terms "ordinary high-water mark". That being all that is really involved in this appeal, we think the judgment should be affirmed, and it is so ordered.

Pullen, P. J., and Thompson, J., concurred.

A petition by intervener and appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 14, 1938. Houser, J., voted for a hearing.